UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EDOUARD SALOMON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 22-cv-10181-ADB |
| MASSACHUSETTS HOUSING FINANCE AGENCY, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS**

BURROUGHS, D.J.

Edouard Salomon ("Salomon" or "Plaintiff"), who is proceeding *pro se*, brings this action against his former employer, Massachusetts Housing Finance Agency ("MassHousing" or "Defendant"). [ECF No. 14 ("Am. Compl.")]. Salomon alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act (the "ADA"), and the Age Discrimination in Employment Act (the "ADEA"). [Id. at 10]. Salomon also brings claims under the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws Ch. 151B, § 4, ("Chapter 151B") and the Massachusetts Equal Rights Act, Mass. Gen. Laws Ch. 93, § 102 ("MERA"). [Id.]. Currently before the Court is Defendant's Motion to Dismiss. [ECF No. 15]. For the following reasons, Defendant's Motion to Dismiss is GRANTED.

1

I.      **BACKGROUND**

For the purposes of this Order, the Court draws the relevant facts from Salomon's

amended complaint, [Am. Compl.], and views them in the light most favorable to him.  See

Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014) (citation omitted).

A.      **Factual Background**

Salomon, a 48-year-old Black man of Haitian descent, was hired by MassHousing in May

2016 as a temporary employee.  [Am. Compl. ¶¶ 4–5].  After working there for approximately

one year, on June 26, 2017, Salomon was hired in a permanent role as a customer service loan

analyst in the Home Ownership Servicing and Operations division.[1]  [Id. ¶ 5].  In that role,

Salomon's main duty was to provide customer service through MassHousing's call center.  [Id. ¶

6].  Employees in the call center, including Salomon, used a software called "Noble Phone

System" which allowed managers to track call receipt, length, and volume, and whether an

employee was logged off.  [Id. ¶ 7].  During the time period that Salomon was employed as a

loan analyst, Jaclyn Kelly ("Kelly") was Salomon's supervisor, Mary Magliozzi ("Magliozzi")

was a Senior Manager, Mounzer Aylouche[2] ("Aylouche") was a Senior Executive Director and

Vice President of Homeownership Programs, and Kevin Mello ("Mello") was a Director.  [Id. ¶¶

9, 16, 31, 83].  Salomon's amended complaint states that Magliozzi, Kelly, and Mello are white

and that Aylouche is "[w]hite/Lebanese."  [Id. ¶ 9].

Salomon suffers from unspecified health issues that required him to use the restroom

after lunch for between 15 and 30 minutes.  [Am. Compl. ¶ 13].  In January 2018, Kelly and

---

[1] In 2017, Salomon applied for a supervisory position at MassHousing, but the position was offered to Jaclyn Kelly.  [Am. Compl. ¶ 12].

[2] Aylouche is alternatively referred to as "Aylouchet."  [Am. Compl. ¶¶ 83–86].

Magliozzi approached Salomon about the length of his bathroom breaks.  [Id. ¶ 14].  Salomon explained his health issues, [id. ¶ 15], and also tried that afternoon to show Magliozzi a doctor's appointment card to substantiate his health issues during a one-on-one conversation, [id. ¶ 16]. When Salomon tried to show Magliozzi the appointment card, she told him that he should speak with Kelly, who was Salomon's supervisor.  [Id.].  Magliozzi told Salomon that by not reporting the issue to Kelly, he was disrespecting her role as his supervisor.  [Id.].  Magliozzi also reprimanded Salomon for his tardiness on inclement weather days, even though his late arrival was the result of public transportation delays.  [Id. ¶ 18].

The following day, Magliozzi asked Salomon if he was responsible for certain "sticky notes" that had been left in the workplace.  [Am. Compl. ¶ 19].  Salomon explained that the notes were not his and that he did not know who they belonged to.  [Id.].  In the days that followed, Magliozzi and Kelly stopped saying "good morning" to him when he arrived, and, in the evening, "management would bid farewell to all other employees but [him]."  [Id. ¶ 20]. Salomon further alleges that, thereafter, management limited contact and interactions with him. [Id. ¶ 21].

In Spring 2018, Salomon requested a meeting with Senior Human Resources Generalist Linda Riccardi Donavan ("Donavan") to discuss his concerns regarding social exclusion and lack of communication, but the meeting did not take place until approximately July 2018.  [Am. Compl. ¶¶ 22, 38, 41].  In the interim, Magliozzi requested to meet with Salomon to speak about the Noble Phone System.  [Id. ¶ 23].  At that meeting, Magliozzi asked him, "you don't want to be here, right?" but Salomon told her that he liked his job.  [Id. ¶¶ 24–25].  Salomon believes, but admits he does not know, that Magliozzi aimed to "entice [him] into making statements

expressing job dissatisfaction[,]" and also believes that she either recorded the meeting or that someone surreptitiously listened to the conversation by phone. [Id. ¶¶ 24, 26].

On June 1, 2018, Salomon received an emergency call regarding his son, changed his computer status to "Work Off Dialer"[3] "without thinking," and went to a conference room to take the call. [Am. Compl. ¶ 27]. Although it was standard practice for employees to take a short break to take a phone call, and multiple employees, including white employees, had done so without concern from management, Kelly summoned Salomon to her office and asked him, in a "stern and aggressive tone[,]" what he had been doing in the conference room and why he had changed his status to "Work Off Dialer" instead of "Break." [Id. ¶¶ 28–29]. Salomon explained the situation, but Kelly expressed skepticism. [Id. ¶ 30].

On June 4, 2018, Salomon emailed Kelly, copying Mello, Donavan, and Magliozzi, to again explain the situation involving the phone call about his son and why he changed his status to "Work Off Dialer" instead of "Break[,]" as well as to express concern that Kelly was not being flexible or understanding regarding his son's emergency. [Am. Compl. ¶¶ 31–32]. On June 11, 2018, Kelly responded to the email, copying Mello, Donavan, and Magliozzi, and listed alleged prior work-related issues that she had experienced with Salomon. [Id. ¶¶ 34–35]. Salomon believes that Kelly was creating a paper trail in preparation for taking adverse employment action against him. [Id. ¶ 36].

In July 2018, Magliozzi called Salomon into her office to discuss the Noble Phone System, but, during the meeting, brought up allegations that Salomon "had made comments

---

[3] The "Work Off Dialer" is a "call state" used by employees to complete work in the Noble Phone System directly after or in connection with a customer call that has been completed, including typing up notes after the call. [Am. Compl. ¶ 29 n.1]. The Court notes that Salomon refers to the status as "Work Off Dialer" and "Work Dialer Off" interchangeably.

about 'management being incompetent[,]'" which Salomon denied having made.  [Am. Compl. ¶¶ 38–39].  During the conversation, Magliozzi also asked Salomon about his health and said, "for a [B]lack man, you must watch your blood pressure[.]"  [ECF No. 23 at ¶ 1]; see [Am. Compl. ¶ 40 (stating that Magliozzi said "for a Black man, you must be careful.")].  Later that week, Salomon met with Donavan and reported Magliozzi's statement regarding his need to be careful about his blood pressure on account of his race and communicated that he felt uncomfortable in the workplace, but Donavan did not require him to make a written complaint. [Am. Compl. ¶¶ 41–42].  After Salomon reported Magliozzi's comment, Kelly and Magliozzi began to consistently reprimand Salomon for "small alleged errors[.]"  [Id. ¶ 44].  Also, in August 2018, Salomon's cubicle was moved to an area directly in front of Kelly and Magliozzi's offices.  [Id. ¶ 43].

On January 18, 2019, Salomon met with Alex Bross ("Bross"), MassHousing's Senior Manager of Construction and Design, and expressed a desire to intern with his department.  [Am. Compl. ¶ 48].  Bross emailed Mello about Salomon taking four hours out of each quarter to intern, but management did not respond to the request.  [Id.].  On February 22, 2019, Salomon asked Kelly for a decision regarding whether he could participate in the internship.  [Id. ¶ 49]. Kelly denied the request and explained that she thought he was "a bad fit."  [Id. ¶ 50].  Salomon then spoke with Mello, who told him that, because of his performance issues, it would "not be good for [him] to take time off the phone."  [Id. ¶ 51].

On February 25, 2019, Salomon attended an unscheduled meeting with Kelly and the head of Human Resources, Mayra Carmona ("Carmona").  [Am. Compl. ¶ 52].  Presumably during the meeting, although it is not clear from the complaint, Salomon received a written warning "for a multitude of reasons including placing his status on 'Work Dialer Off' more

frequently in comparison to his peers, absenteeism and taking longer than normal bathroom breaks after lunch every day" and was placed on a 90-day performance improvement plan ("PIP"). [Id. ¶¶ 53–54, 66]. This was the first written warning for a performance issue that Salomon received since he began working for MassHousing in 2016. [Id. ¶ 56]. Salomon explained that he put his phone on "Work Dialer Off" more frequently than other employees because, unlike his co-workers, he took notes after most of his phone calls. [Id. ¶ 55]. Salomon asked Kelly and Carmona to show him data comparing his performance to that of his peers, but they refused, telling him that his only recourse was to submit a written rebuttal, which he filed in early March 2019. [Id. ¶¶ 57–59]. Salomon's PIP, which he received on February 25, 2019, "contained performance benchmarks that had never been met by any employees in the past" and "rules [that] were specific only to [him]." [Id. ¶¶ 52, 54, 62–63]. The PIP also required Salomon to meet with Kelly for weekly trainings. [Id. ¶ 65]. And although MassHousing's policy only required notifying one member of management if an employee was going to be late or absent, Salomon's PIP required that he notify two members of management. [Id. ¶ 64].

Defendant was concerned by the written warning and the PIP because Kelly had hired predominantly younger people in the months leading up to the February meeting, and he perceived that Kelly was more lenient with younger employees. [Am. Compl. ¶ 60]. He also noted that a white co-worker, Adam Krings[4], had a record of excess absenteeism but was promoted by Kelly and Magliozzi. [Id. ¶ 61].

On March 4, 2019, Carmona notified Salomon that because his performance had improved, the PIP had been eliminated and his prior written warning had been retracted and reduced to a verbal warning. [Am. Compl. ¶ 67]. Salomon was asked to sign a paper stating that

---

[4] Krings is alternatively referred to as "Kring[.]" [Am. Compl. ¶¶ 9, 61].

he had been issued a verbal warning, but he refused to do so.  [Id. ¶ 68].  At the meeting, Salomon told Carmona that managers had different expectations for him than for his white co-workers, expressed concern about the relative lack of upward mobility for Black employees as compared to their white peers, and said that he had once been denied restroom use.  [Id. ¶ 69]. Although the PIP had been lifted, Carmona told Salomon that he was still required to attend weekly training meetings with Kelly "because I [*i.e.*, Carmona] am ordering you to."  [Id. ¶ 70]. Salomon attended the weekly trainings, but Kelly failed to provide any training and the meetings lasted a maximum of five minutes each.  [Id. ¶¶ 71–72].  Salomon believes that Defendant was using the trainings as a farce to later justify terminating him.  [Id. ¶ 73].

On June 26, 2019, Salomon attended a meeting with Kelly to receive his annual performance review.  [Am. Compl. ¶ 74].  The review stated that Salomon had not met the minimum score of 2 out of 4, instead receiving a 1.75.  [Id. ¶ 75].  This was despite the fact that Salomon "had received the most or one of the most volumes of calls in 2018[,]" and that he had received a review of 2.75 or 3 the prior year.  [Id. ¶¶ 76–77].  Plaintiff further states that the information in his June 2019 performance review was identical to that in the February 2019 PIP. [Id. ¶ 78].  Additionally, even though he had been told that his written warning had been retracted and reduced to a verbal warning, the written warning was appended to the performance review.  [Id. ¶ 79].  Salomon asked Kelly for a copy of the performance review, but was told that he would receive an emailed copy of the review once he signed it, which he refused to do.  [Id. ¶¶ 80–82].

On August 6, 2019, Salomon met with Aylouche to express his concerns about how he was being treated, including that his race was influencing his treatment.  [Am. Compl. ¶ 83]. During the meeting, Aylouche referenced the performance review and "pressure[ed]" Salomon to

sign it, but Salomon refused.  [Id. ¶ 84].  Aylouche also suggested that Salomon write a rebuttal to the review.  [Id. ¶ 85].  Ten minutes after Salomon's meeting with Aylouche, Kelly emailed Salomon his 2019 performance review, and Salomon then told Aylouche that he would not write a rebuttal.  [Id. ¶ 86].

Salomon's performance review and interactions with management led him to believe that "he was intentionally being targeted for termination[,]" which led to "issues with his health and blood pressure."  [Am. Compl. ¶¶ 87–88].  This prompted Salomon to take a medical leave of absence effective September 5, 2019, which was approved by a physician and accepted by Defendant's human resources department.  [Id. ¶ 88].  Salomon remained on leave for more than two and a half years, until his position was terminated.  See [id. ¶¶ 88–96].  During his leave, Salomon took courses at Harvard University Graduate School through Defendant's tuition reimbursement program, which the amended complaint implies, but does not state, he was doing prior to his leave.  [Id. ¶ 89].  On February 1, 2020, Defendant changed its tuition reimbursement policy to exclude employees who were on disability leave greater than 15 days.[5]  [Id. ¶ 91].

In December 2019, while on leave, Salomon filed a complaint with the MCAD against MassHousing, Magliozzi, and Kelly, which alleged racial discrimination and retaliation.  [Am. Compl. ¶ 90].  On January 11, 2022, MCAD issued Salomon a "right to sue" letter, and Salomon filed the instant lawsuit on February 3, 2022.  [Id. ¶¶ 93–94].  On May 5, 2022, Salomon was invited to a meeting via zoom with human resources on May 9, 2022, though it is not clear if that meeting occurred.  [Id. ¶ 95].  On May 10, 2022, Defendant terminated Salomon's employment

---

[5] During a subsequent investigation by the Massachusetts Commission Against Discrimination ("MCAD"), Defendant admitted that Salomon was the only employee affected by this policy change.  [Am. Compl. ¶ 92].

effective July 31, 2022, nearly three years after he went on disability leave, due to his position being eliminated.  [Id. ¶ 96].

### B.      Procedural History

Salomon filed a complaint with the MCAD on December 23, 2019.  [ECF No. 16-1]. The MCAD began an investigation and informed Salomon on January 11, 2022 that the investigation would not be completed within 18 months of when the complaint was filed.  [ECF No. 1-2 at 9].  The MCAD reminded Salomon of his right to remove the case by initiating a civil action in state superior or federal court and informed him that removing his case from the MCAD would result in dismissal of the MCAD complaint.  [Id.].  Salomon responded on February 7, 2022 that he wished to file a private right of action, and the MCAD dismissed his complaint on March 31, 2022.  [ECF No. 4-1].

Salomon filed his original complaint in this Court on February 3, 2022.  [ECF No. 1].  On July 7, 2022, the defendants named in the original complaint filed a motion to dismiss.  [ECF No. 12].  Salomon then filed an amended complaint dropping all defendants except MassHousing, [Am. Compl.], which effectively mooted the first motion to dismiss.  See [ECF No. 17 (order denying as moot first motion to dismiss)].  MassHousing thereafter filed a second motion to dismiss on August 11, 2022, [ECF No. 15], and Salomon filed a response to that motion on March 1, 2023, [ECF No. 23].

## II.    DISCUSSION

Salomon brings a variety of discrimination claims against MassHousing, including claims under Title VII, the ADA, the ADEA, Chapter 151B, and MERA.  [Am. Compl. ¶¶ 98–99]. Defendant responds that the complaint should be dismissed for failure to make timely or proper service, failure to state a viable claim for relief, failure to exhaust administrative remedies, and

because the complaint is barred, in whole or in part, by the applicable statute of limitations. [6] [ECF No. 15].

### A.     Insufficient Service of Process

#### i.     Legal Standard

"Rule 12(b)(5) empowers courts to dismiss a complaint for insufficient service of process." Evans v. Staples, Inc., 375 F. Supp. 3d 117, 120 (D. Mass. 2019) (citing Fed. R. Civ. P. 12(b)(5)). Generally, "[t]he plaintiff is responsible for having the summons and complaint served [on the defendant] within the [ninety days] allowed by Rule 4(m) and must furnish the necessary copies to the person who makes service." Fed. R. Civ. P. 4(c)(1). A plaintiff must show good cause for failure to file within 90 days to withstand a 12(b)(5) motion on these grounds. See Aaron v. City of Lowell, No. 20-cv-11604, 2022 WL 623800, at *2 (D. Mass. Mar. 3, 2022); see also Fed. R. Civ. P. 4(m) ("But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."). "When faced with a Rule 12(b)(5) motion for insufficiency of process, this [C]ourt may 'look beyond the pleadings and may consider affidavits and other documents to determine whether process was properly served.'" Afrasiabia v. Awad, No. 14-cv-10239, 2015 U.S. Dist. LEXIS 132092, at *28 (D. Mass. Sep. 14, 2015) (quoting Morse v. Mass. Exec. Off. of Pub. Safety, No. 12-cv-40160, 2013 WL 1397736, at *1 (D. Mass. Apr. 4, 2013), then citing Fed. R. Civ. P. 4(l)(1)).

---

[6] Defendant also raises the issue of potential "ghost-writing" of the amended complaint, which the Court need not address given the deficiencies in the complaint. However, the Court notes that "[i]f a brief is prepared in any substantial part by a member of the bar, it must be signed by him[,]" Ellis v. State of Maine, 448 F.2d 1325, 1328 (1st Cir. 1971), and that any counsel is required to file a notice of appearance with this Court.

### ii.        Application

Defendant argues that the Amended Complaint should be dismissed for insufficient service of process under Federal Rule of Civil Procedure 12(b)(5) because Salomon failed to serve the complaint within 90 days of filing as required by Fed. R. Civ. P. 4(m).  [ECF No. 16 at 2].  The Court declines to dismiss the complaint on this basis because—for the reasons set forth in the Court's order entered on February 9, 2023—the delay in service was not attributable to Salomon and, moreover, Salomon was diligent in attempting to effectuate service once summons issued.  See [ECF No. 22].  Consistent with its prior order, the Court DENIES Defendant's motion to the extent it seeks dismissal for insufficient service.

### B.        Failure to State a Claim

The Court next turns to Defendant's argument that Salomon's amended complaint fails to state a claim.

### i.        Legal Standard

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pled facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).  Additionally, "a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice."  MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)).

A complaint "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief[,]'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and must "set forth factual allegations, either direct

or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory[,]" Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988). Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

 "To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Iqbal, 556 U.S. at 678). "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible . . . ." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)). "The plausibility standard invites a two-step pavane." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45). First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Secondly, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224).

The plausibility standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citations omitted).

Because Salomon is proceeding *pro se*, the Court construes the complaint liberally and holds his "pleadings to less demanding standards than those drafted by lawyers and endeavors, within reasonable limits, to guard against the loss of *pro se* claims due to technical defects." Santiago v. Action for Bos. Cmty. Dev., Inc., No. 17-cv-12249, 2018 WL 5635014, at *2 (D. Mass. Oct. 31, 2018) (quoting Dutil v. Murphy, 550 F.3d 154, 158 (1st Cir. 2008)) (further citation omitted); see also Erickson v. Pardus, 551 U.S. 89, 94 (2007). "However, pro se status does not insulate a party from complying with procedural and substantive law." Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997) (citation omitted). Dismissal of a *pro se* complaint is appropriate "when the complaint fails to state an actionable claim." Muller v. Bedford VA Admin. Hosp., No. 11-cv-10510, 2013 WL 702766, at *3 (D. Mass. Feb. 25, 2013) (citing Overton v. Torruella, 183 F. Supp. 2d 295, 303 (D. Mass. 2001)).

### ii.    Discussion

Salomon asserts that Defendant discriminated against him on the basis of his race in violation of Title VII, on the basis of disability in violation of the ADA, and on the basis of age in violation of the ADEA, and that Defendant violated Chapter 151B and MERA. See [Am. Compl. ¶¶ 98–99]. Defendant moves to dismiss the claims, asserting that Salomon has failed to state a claim under any of these statutes. Because the Court agrees with Defendant, each of Salomon's claims is DISMISSED.

### 1.    Title VII and Chapter 151B Claims for Disparate Treatment & Hostile Work Environment

To make out a *prima facie* case for disparate treatment under either Title VII or Chapter 151B, a plaintiff must show: "(1) [he] is a member of a protected class; (2) [he] was qualified for

[his] position; (3) [his] employer took an adverse employment action against [him]; and (4) some evidence of a causal link between [his] protected status and the adverse employment action." Evans v. Staples, Inc., 375 F. Supp. 3d 117, 123 (D. Mass. 2019) (citing Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 70 (1st Cir. 2011)).  The elements of a claim for hostile work environment under Title VII or Chapter 151B include that (1) the plaintiff is a member of a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was based on the protected status, (4) the harassment was so severe or pervasive as to create an abusive work environment, and (5) the harassment was objectively and subjectively offensive.  Avci v. Brennan, 285 F. Supp. 3d 437, 442 (D. Mass. 2018) (citing Prescott v. Higgins, 538 F.3d 32, 42 (1st Cir. 2008)).

> Additionally,

> any person seeking relief under Title VII [or Chapter 151B] must file a charge with the EEOC "within one hundred and eighty days after the alleged employment practice occurred," or, if a claim is filed with a state or local agency "within three hundred days after the alleged unlawful employment practice occurred[.]"

Rodriguez v. Smithkline Beecham, 224 F.3d 1, 7 (1st Cir. 2000) (internal citation omitted) (quoting 42 U.S.C. § 2000e-5(e)(1)); Alston v. Massachusetts, 661 F. Supp. 2d 117, 123 (D. Mass. 2009) ("A plaintiff must file a Title VII or 151B claim within 300 days of the discriminatory act.").  In Massachusetts, if a plaintiff elects to file a charge with the MCAD the charge must be filed "within 300 days of the latest alleged discriminatory event."  Harrington v. Lesley Univ., 554 F. Supp. 3d 211, 221 (D. Mass. 2021) (citations omitted); Goldstein v. Brigham and Women's Faulkner Hosp., Inc., 80 F. Supp. 3d 317, 323 (D. Mass. 2015).  For discrete acts that give rise to a disparate treatment claim, that means that the allegedly unlawful employment practice must have occurred within 300 days before the filing of the administrative charge.

Salomon filed his MCAD complaint on December 23, 2019.  Therefore, only acts that occurred between February 26, 2019 and December 23, 2019 may form the basis for Defendant's

liability for Salomon's disparate treatment claim under either Title VII or Chapter 151B.

Construing the complaint generously, the Court identifies a handful of allegations that potentially

relate to a disparate treatment claim, including that: (1) he filed a written rebuttal to being placed

on a PIP, which noted that a white co-worker "had a record of excess absenteeism but was

promoted[,]" [Am. Compl. ¶¶ 54, 59, 61]; (2) he expressed concern to Carmona regarding "the

history of upward mobility of [w]hite employees and lack thereof for Black employees[,]" [id. ¶

69]; (3) he received an unsatisfactory score on his performance review, [id. ¶ 75]; and (4) during

a meeting with one of Defendant's executives on August 6, 2019, he expressed his concern that

race influenced his treatment at work, [id. ¶ 83].[7]

The only allegation that plausibly qualifies as an adverse employment action is the

negative performance review.  Compare de Jesus v. Potter, Fed. App'x 5, 9 (1st Cir. 2006)

("Generally, an adverse employment action involves a discrete change in the terms and

conditions of employment, such as 'hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing significant change in benefits.'"

(quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)), and Abouhamad v. Bank

of Am., Corp., No. 10-cv-11133, 2012 WL 4023579, at *6 (D. Mass. Sept. 11, 2012) ("While a

reprimand may constitute an adverse action, it must carry with it tangible consequences in

addition to correcting some workplace behavior that management perceived as needing

correction." (citing Bhatti, 659 F.3d at 73)).  But even assuming it qualifies as such, Salomon

nonetheless fails to plausibly state a claim for disparate treatment because there are no

allegations within the 300-day period that suggest that the performance review was related to

---

[7] Plaintiff cannot rely on his subsequent termination in 2022 as a basis for liability because he has not alleged that he filed a complaint with MCAD or EEOC related to that action, or that the termination was motivated by any discriminatory animus.

Salomon's race.  The only instances in which race was mentioned involved Salomon himself sharing his race-based concerns with various of Defendant's employees, but there are no factual allegations attributable to Defendant that suggest any race-based discriminatory motive. Although at the pleading stage Salomon is not required to plead facts sufficient to establish a *prima facie* case, the elements "are not irrelevant to a plausibility analysis" and "are part of the background against which a plausibility determination should be made."  Evans, 375 F. Supp. 3d at 123 (citations omitted).  Moreover, at this stage a "plaintiff must allege a series of facts which at the very least gives rise to an inference of discriminatory animus[,]" id. at 124 (quoting Johnson v. Gen. Elec., 840 F.2d 132, 138 (1st Cir. 1988) abrogated on other grounds by Clockedile v. N.H. Dep't. of Corr., 245 F.3d 1 (1st Cir. 2001)), and Salomon has not done so. Accordingly, his disparate treatment claim is DISMISSED.

Salomon's hostile work environment also fails.

In deciding a hostile work environment claim, "a court must mull the totality of the circumstances, including factors such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

Cabi v. Bos. Child.'s Hosp., 161 F. Supp. 3d 136, 153 (D. Mass. 2016) (quoting Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005)).  Considering the amended complaint as a whole, the Court finds that Salomon has not plausibly alleged a racially motivated hostile work environment.  The only race-based comment made is that Magliozzi told him, "for a [B]lack man, you must watch your blood pressure[.]"  [ECF No. 23 ¶ 1].  On its face, that comment is not threatening and, even if it could be construed as such, it is one isolated statement and not the kind of pervasive, repetitive harassing behavior that supports a hostile work environment claim. Cf. Cabi, 161 F. Supp. 3d at 153–54 (finding that frequent, regular comments taken together

were "sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment." (citation omitted)).  Salomon's other allegations—that supervisors talked to him about the length of his bathroom breaks, didn't say good morning or good evening to him, generally limited their interactions with him, and moved his cubicle to be proximate to their offices—do not constitute harassing behavior and, moreover, lack any indication of race-based motivation.  Because Salomon has not plausibly pled a hostile work environment, the claim is also <u>DISMISSED</u>.

2.    <u>Title VII and Chapter 151B Retaliation Claim</u>

Salomon argues that Defendant retaliated against him for engaging in conduct protected by Title VII and Chapter 151B.  "Both Title VII and Chapter 151B contain provisions that prohibit employers from retaliating against persons who complain about unlawful discriminatory employment practices."  <u>Baer v. Montachusett Reg'l Tech. Sch. Dist.</u>, 380 F. Supp. 3d 143, 151 (D. Mass. 2019) (citing 42 U.S.C. § 2000e-3(a); Mass. Gen. Laws ch. 151B, § 4(4)).  To have complained about or opposed an unlawful practice, an employee "'need not prove that the conditions against which he protested actually amounted to a violation of Title VII,' but must demonstrate that he held a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'"  <u>Ray v. Ropes & Gray LLP</u>, 961 F. Supp. 2d 344, 358 (D. Mass. 2013) (quoting <u>Fantini v. Salem State Coll.</u>, 557 F.3d 22, 32 (1st Cir. 2009)), <u>aff'd</u>, 799 F.3d 99 (1st Cir. 2015).  To make out a *prima facie* case of retaliation under Title VII, "a plaintiff must show that (i) [he] undertook protected conduct, (ii) [he] suffered an adverse employment action, and (iii) the two were causally linked."  <u>Noviello</u>, 398 F.3d at 88 (citations omitted).  At the motion to dismiss stage, a plaintiff "need not establish all elements of the prima facie case" and "must simply allege facts that give rise to a plausible inference that retaliation

17

occurred." <u>Frith v. Whole Foods Market, Inc.</u>, 38 F.4th 263, 276–77 (1st Cir. 2022) (citing <u>Garayalde-Rijos v. Mun. of Carolina</u>, 747 F.3d 15, 24 (1st Cir. 2014)).

Construing the amended complaint generously, Salomon appears to allege that he engaged in protected conduct when he took the following actions: (1) in the first week of March 2019 he submitted a written rebuttal after receiving a written warning for "a multitude of reasons[,]" including placing his phone status on "Work Dialer Off," absenteeism, and taking longer than normal bathroom breaks, [Am. Compl. ¶¶ 53, 59]; (2) around the same time he "expressed to Carmona the differences in work expectations between him and [w]hite colleagues" and concerns "related to the history of upward mobility of [w]hite employees and lack thereof for Black employees[,]" [<u>id.</u> ¶ 69]; and (3) and in August 2019 he "expressed his concerns about his treatment and his concern that his race influenced his treatment" in a meeting with Aylouche, [<u>id.</u> ¶ 83].

The Court concludes, even assuming that Plaintiff has plausibly alleged that he participated in oppositional conduct—which is questionable—and was subject to an adverse employment action, the claim nonetheless fails because the amended complaint does not plausibly allege a connection between his negative performance review and the race-based concerns he shared with supervisors.  At most, Salomon alleges that the review was not justified because it considered information that should have been excluded (<i>e.g.</i>, his written warning), but there is no allegation that it was related to his expressing concern about different treatment for employees based on race.  Because Plaintiff has not plausibly alleged that his negative performance review was impermissibly tainted by a discriminatory animus, his retaliation claim is <u>DISMISSED</u>.

18

3.     ADA Claim and Chapter 151B on the Basis of Disability

Salomon brings a claim under the ADA but does not specify the type of claim.  The Court

infers, based on the amended complaint, that he intended to bring claims for failure to reasonably

accommodate his disability and for disparate treatment.  The Court further assumes that Salomon

also intended to bring parallel claims under Chapter 151B.[8]  To make out a *prima facie* case for

failure to accommodate under the ADA, "a plaintiff must show that (1) [he] suffers from a

disability or handicap; (2) [he] could perform the essential functions of [his] job with reasonable

accommodations[;] (3) [he] requested reasonable accommodations; and (4) [his] employer,

despite knowing of his disability, denied to grant [him] reasonable accommodations."  Callbeck,

480 F. Supp. 3d at 313 (citing Freadman v. Metro. Prop. and Cas. Ins. Co., 484 F.3d 91, 102 (1st

Cir. 2007); Gudava, 440 F. Supp. 3d at 58).  The elements of a claim for disparate treatment

under the ADA include the first two prongs of the reasonable accommodation claim, and also a

third prong that requires a plaintiff to show that he was fired or otherwise treated adversely

because of his disability.  See Echevarria v. AstraZeneca Pharm. LP, 856 F.3d 119, 126 (1st Cir.

2017).

The Court finds that Salomon has failed to state a claim for disparate treatment or failure

to accommodate under the ADA.  Salomon's claims fail at the first hurdle.  "An individual is

disabled for purposes of the ADA if he (1) has a physical or mental impairment that substantially

limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded

as having such an impairment."  Roman-Oliveras v. P.R. Elec. Power Auth., 655 F.3d 43, 48 (1st

---

[8] "Because Chapter 151B 'tracks the ADA in virtually all respects,' the Court analyzes the state
and federal law claims together."  Callbeck v. Fallon Cmty. Health Plan, Inc., 480 F. Supp. 3d
308, 313 n.3 (D. Mass. 2020) (quoting Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 20
n.5 (1st Cir. 2002), then citing Gudava v. Ne. Hosp. Corp., 440 F. Supp. 3d 49, 58 (D. Mass.
2020)).

Cir. 2011) (citations omitted).  Salomon does not allege that he was disabled, has a record of a disability, or was regarded as being disabled.  The Court nonetheless considers whether, generously construed, the amended complaint can be read to plead the necessary facts concerning a disability.

To satisfy the first prong, Salomon must establish (1) that he suffers from a physical or mental impairment, (2) that it affects life activities that are "major," *i.e.*, "of central importance to daily life[,]" and (3) that the impairment "'substantially limits' the identified major life activity." Ramos-Echevarria v. Pichis, Inc., 659 F.3d 182, 187 (1st Cir. 2011) (citations omitted).  The Court notes that work qualifies as a major life activity, that the limitation caused by the impairment must be permanent or long term, and that the impairment must limit plaintiff "to a substantial extent."  Id.

As for the first and second elements, the Court finds that Salomon has pled that he suffers from a physical impairment and that it impacts his ability to work.  The question then is whether his impairment substantially limits his ability to work.  The Court finds that it does not.

The First Circuit's decision in Ramos-Echevarria is instructive.  There, the court considered whether a plaintiff who suffered from epilepsy qualified as disabled and, in particular, whether his epilepsy substantially limited his ability work.  The plaintiff claimed that his ability to work was substantially limited because "he has to stop working temporarily when he has an episode" and that multiple times per year he experienced seizures so severe that he had to leave work.  Ramos-Echevarria, 659 F.3d at 188–89.  The plaintiff, however, did not "introduce evidence that his impairment affect[ed] a major life activity outside of the workplace."  Id. at 188.  In making its determination, the court considered the EEOC's definition of "substantially limits" as

"[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity."

Id. at 188–89 (alterations in original) (quoting 29 C.F.R. § 1630.2(j)(1)(ii) (1991)).  The court concluded based on the facts alleged that the plaintiff's epilepsy, although "clearly affect[ing] his life," did not substantially limit his ability to work.

The allegations in the amended complaint suggest the impairment Salomon experiences is less severe than the plaintiff in Ramos-Echevarria.  In particular, Salomon does not allege any limitation to his ability to work other than needing to take a slightly extended break after lunch. Unlike the plaintiff in Ramos-Echevarria, there are no allegations that his impairment is ever so severe that it prevents him from working at all or requires him to leave work and go home. Salomon does not allege that he experiences any symptoms nearly as serious as seizures while at his workplace.  And Salomon, like the plaintiff in Ramos-Echevarria, has not alleged that his impairment limits any other major life activity outside of the workplace.  Based on the allegations in the amended complaint, the Court does not find that Salomon has alleged he has a disability as defined by the ADA.

The Court must also consider whether Salomon had a record of a substantially limiting impairment or was regarded as having a substantially limiting impairment.  As for the record of impairment, although Salomon alleges that he had a doctor's appointment card regarding his need for bathroom breaks, because the Court has determined that impairment does not substantially limit a major life activity, the appointment card cannot be construed as a record of a substantially limiting impairment.  Finally, the Court further finds that Salomon has not pled that he was regarded as having an impairment that substantially limits a major life activity as the

amended complaint states only that supervisors knew he needed to use the bathroom after lunch. As discussed, this Court finds that this need does not qualify as a disability under the ADA and thus his supervisors' knowledge of it does not suffice to show they perceived him as disabled.

Because Salomon has not sufficiently pled that he is disabled under the ADA, his ADA and parallel state claims fail and are accordingly DISMISSED.

### 4.    ADEA Claim and Parallel Chapter 151B Claim

Salomon also brings a claim under the ADEA, but similar to his ADA claims, he does not specify what claims he brings under the statute.  As best the Court understands, Salomon brings a claim for discrimination, also referred to as disparate treatment, under the ADEA.  He has also alleged a blanket violation of Chapter 151B, which like the ADEA, prohibits discrimination on the basis of age.  Mass. Gen. Laws Ch. 151B, § 4(1)(B), (C).  Because "[t]he standards applied for age discrimination claims under federal law and Massachusetts state law are so similar . . . those claims can be analyzed together."  Connolly v. Shaw's Supermarkets, Inc., 355 F. Supp. 3d 9, 15 (D. Mass. 2018) (citing Tombeno v. FedEx Corp. Servs., Inc., 284 F. Supp. 3d 80, 86 (D. Mass. 2018)).

To survive a motion to dismiss, "the complaint must set forth some facts indicating a relationship between the plaintiff's protected characteristic (such as . . . age) and some adverse employment action taken against the plaintiff."  Alicea v. N. Am. Cent. Sch. Bus, LLC, 232 F. Supp. 3d 213, 215 (D. Mass. 2017). "Put simply, the complaint has to allege a plausible basis for a claim of *discrimination*, not just unfair treatment."  Id.  Here, the only timely, relevant allegation regarding age is that Salomon was concerned because he had "noticed [that his supervisor] had hired predominantly younger people in their 20s or early 30s in the previous months and that following these new hires, [his supervisor] was more lenient with these younger employees with respect to discipline for poor performance, bathroom breaks, and absenteeism."

[Am. Compl. ¶ 60].  Salomon, however, does not offer any allegations in his complaint to connect that concern to his negative performance review, which is what would be required to plausibly plead discrimination.  As noted above, Salomon does not even allege that his negative performance review was pretextual; he merely asserts that the performance review referenced information that should have been excluded (*e.g.*, the written warning he received).  See [id. ¶ 79].  Because the amended complaint "contains no real allegation of [age] discrimination at all, much less a plausible one[,]" Alicea, 232 F. Supp. 3d at 216, Salomon's claim for age discrimination is DISMISSED.

### 5.    MERA Claim

Plaintiff also seeks to bring a claim under MERA but cannot because "Chapter 151B is the exclusive state law remedy for employment discrimination complaints."  Bhawan v. Fallon Clinic, Inc., 5 F. Supp. 2d 64, 67 (D. Mass. 1998) (citing Woods v. Friction Materials, Inc., 30 F.3d 255, 264 (1st Cir.1994), overruled on other grounds by Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)).  Therefore where, as here, "chapter 151B is applicable, a plaintiff may not pursue a claim under MERA." Ray, 961 F. Supp. 2d at 360 (citations omitted); see also Green v. Wyman-Gordon Co., 664 N.E. 2d 808, 811 (Mass. 1996) ("Accordingly, where [Chapter] 151B applies, a person may not evade its procedural requirements by recasting a discrimination claim as a violation of [MERA] . . . ." (citation omitted)).  Salomon fails to allege specific facts as a basis for his MERA claim, but even from a generous reading of the amended complaint, it appears to this Court that the MERA claim would be substantively the same as his Chapter 151B claims, just pled under a different statute.  Salomon's MERA claim is therefore preempted by Chapter 151B and DISMISSED.  See James v. Bos. Police Dep't, No. 19-cv-10430, 2020 WL 108266, *4 (D. Mass. Jan. 9, 2020).

### III.     CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss, [ECF No. 15], is

<u>GRANTED</u> and Salomon's claims under Title VII, the ADA, the ADEA, Chapter 151B, and

MERA are <u>DISMISSED</u>.  Plaintiff may file a motion for leave to amend his complaint,

supported by a proposed second amended complaint, within 21 days.

**SO ORDERED.**

March 21, 2023                                                    /s/ Allison D. Burroughs
                                                                 ALLISON D. BURROUGHS
                                                                 U.S. DISTRICT JUDGE